2008 ME 42

### Ken ANDERSON et al.

v.

### Marsha C. O'ROURKE et al.

Supreme Judicial Court of Maine.

Argued: Jan. 17, 2008.

Decided: March 4, 2008.

Mark G. Lavoie, Esq., Christopher C. Taintor, Esq. (orally), Norman, Hanson & DeTroy, L.L.C., Portland, ME, for Marsha O'Rourke, M.D. and Androscoggin Clinical Associates.

Panel: ALEXANDER, LEVY, SILVER, and MEAD, JJ.*

LEVY, J.

[¶ 1]   Ken Anderson and Kathleen Timmermeyer, the co-personal representatives of the estate of Jacqueline Anderson, appeal from a judgment entered in the Superior Court (Androscoggin County, *Gorman, J.*) in favor of Marsha C. O'Rourke, M.D., and Androscoggin Clinical Associates, after a jury verdict finding O'Rourke not negligent in Jacqueline Anderson's death.  The representatives assert that the trial court (1) abused its discretion during trial in reversing, without notice, a prior in limine order allowing the introduction of evidence regarding the defense expert's relationship with O'Rourke's insurer;  (2) committed an error of law serious enough to warrant reversal in barring the introduction of this evidence;  and (3) abused its discretion in denying their motion for a new trial.  We affirm the judgment.

## I.  BACKGROUND

[¶ 2]   Jacqueline Anderson had a difficult medical history that included hypertension, congestive heart failure, and diabetes.  On three separate occasions prior to her death, she had been hospitalized for complications from cellulitis, a skin infection.  Her symptoms were similar on each occasion:  warm skin, fever, pain, elevated white blood cell count, elevated bands, nausea, and vomiting.  On each prior admission, an infectious disease specialist became involved in her care, and, on two of

John H. Branson, Esq. (orally), Law Office of John H. Branson, P.A., Portland, ME, for Ken Anderson and Kathleen Timmermeyer.

* *Saufley, C.J.,* sat at oral argument but did not participate in the development of the opinion.

these occasions, she was transferred to the intensive care unit.

[¶ 3] In April 2001, Jacqueline was again admitted to the hospital due to pain, redness, and swelling on her left thigh. Her primary care physician had seen the same symptoms during her prior hospitalizations for cellulitis and admitted her to the hospital with a diagnosis of cellulitis and dehydration.

[¶ 4] Jacqueline's condition worsened and both an intensive care specialist and an infectious disease specialist were consulted. Her left leg was about twice the size of her right leg and the infectious disease specialist, who was trained to diagnose cellulitis and necrotizing fasciitis, determined that cellulitis remained the most likely explanation.

[¶ 5] The infectious disease specialist consulted with O'Rourke, a general surgeon, to discuss the possibility of necrotizing fasciitis, a rare flesh eating bacterial infection. O'Rourke concluded that Jacqueline could be suffering from cellulitis. Although she recognized that necrotizing fasciitis was a possible explanation and could only be definitively diagnosed through surgery, O'Rourke believed that the evidence did not reach a threshold necessary to risk surgery because any surgery might be fatal to Jacqueline given her compromised physical state. O'Rourke, therefore, did not definitively diagnose Jacqueline either way, adopted a wait and watch approach, and informed her colleagues that she would be available if the situation changed.

[¶ 6] Although O'Rourke was available for consultation and at the hospital all of the following day, the team treating Jacqueline did not contact her until two days later. By that time, Jacqueline's condition had worsened. Given Jacqueline's deteriorating situation, the primary care physician determined Jacqueline needed to be re-evaluated for necrotizing fasciitis. Because O'Rourke was in surgery all day, she referred Jacqueline's primary care physician to another surgeon, who diagnosed necrotizing fasciitis and performed surgery. Jacqueline died five days later.

[¶ 7] The representatives subsequently filed a notice of claim on behalf of the estate alleging negligence resulting in Jacqueline's death on the part of (1) the primary care physician; (2) the primary care physician's practice; (3) St. Mary's Regional Medical Center, on the theory that the primary care physician was its agent or employee; (4) Dr. O'Rourke; (5) Dr. O'Rourke's practice, Androscoggin Clinical Associates; (6) the surgeon who performed the surgery; and (7) the surgeon's practice. The surgeon and his practice were subsequently voluntarily dismissed from the suit, while the remaining claims were submitted to the prelitigation screening panel. The panel found that only O'Rourke had breached the applicable standard of care with her acts or omissions and that her negligence proximately caused the injury of which the representatives complained.

[¶ 8] The representatives proceeded to file a twelve-count complaint against all of the remaining parties to the suit, alleging wrongful death, survival statute claims, negligent infliction of emotional distress, and vicarious liability. Prior to trial, the representatives filed a motion in limine that requested the Superior Court to rule in advance on the admissibility of bias and financial interest evidence related to the credibility of O'Rourke's expert witness, Dr. Frederick Radke. The court granted the motion and ruled that the representatives would be permitted "to question defense experts with regards to their affiliation with Defendants O'Rourke and Androscoggin Clinical Associates professional liability insurance carrier to ex-

plore and show the defense experts' bias in this case...." The remaining defendants, with the exception of O'Rourke and her practice, were subsequently dismissed from the suit and a five-day jury trial was held.

[¶ 9] During trial, O'Rourke offered the testimony of Dr. Radke and the personal representatives conducted a voir dire examination of Dr. Radke outside the jury's presence. When the representatives asked about Dr. Radke's relationship with Medical Mutual Insurance Company (MMIC), O'Rourke objected. After permitting the representatives to conduct an extensive voir dire of Dr. Radke outside the presence of the jury, the court ruled that such evidence was inadmissible absent some evidence showing that Dr. Radke's relationship to MMIC extended beyond mere membership in MMIC. Neither the representatives nor O'Rourke brought to the court's attention the court's previous in limine order allowing this questioning. Dr. Radke proceeded to testify that O'Rourke properly treated Jacqueline.

[¶ 10] At the close of trial, the jury found O'Rourke had not breached the standard of care and returned a verdict in her favor. The representatives filed a motion for a new trial, which the court denied, and this appeal followed.

## II. DISCUSSION

[¶ 11] We address, in order, the representatives' contentions that the court erred or abused its discretion by (A) violating the "law of the case doctrine" when it refused to admit evidence of insurance; (B) concluding pursuant to M.R. Evid. 403 that the prejudicial effect of the insurance evidence outweighed its probative value; and (C) denying their motion for a new trial.

### A. The Law of the Case Doctrine

[¶ 12] The representatives first contend that the Superior Court abused its discretion by reversing its in limine ruling that the representatives would be permitted to introduce insurance evidence to show Dr. Radke's relationship with O'Rourke's insurer. They assert that the court's in limine decision constituted the "law of the case" from which the court was bound not to deviate. We conclude that the representatives failed to preserve this asserted error for appellate review.

[¶ 13] To preserve an issue for appeal, a party must not only object, but must also "state the specific grounds of its objection, thereby allowing the trial court the opportunity either to make additional findings of fact essential to appellate review or, having been advised of previously unnoticed legal authority, to reconsider its previous ruling in a new light." *Wellstone Partners v. J & M Constr. Co.,* 581 A.2d 789, 791 (Me.1990); *see also* M.R. Civ. P. 46. A pretrial objection to or proffer of evidence will not normally be sufficient to preserve an issue for appellate review; at the time of trial the party must raise anew the objection or proffer. *See* M.R. Evid. 103(c); *see also State v. Oeur,* 1998 ME 82, ¶ 4, 711 A.2d 118, 119. Because the representatives had the opportunity to raise their law of the case doctrine objection to the court's decision at trial not to admit the insurance evidence, but failed to do so, the representatives have not preserved this issue for appellate review.[1] *See Land-*

---

1. Even if the issue was preserved for our review, we would have little difficulty in concluding that the trial court's decision to exclude evidence of insurance did not violate the law of the case doctrine. This doctrine is an articulation of the sound policy that a trial judge should not in the same case overrule or reconsider the decision of another trial judge.

*mark Realty v. Leasure,* 2004 ME 85, ¶ 10, 853 A.2d 749, 751.

## B. Exclusion of Evidence of Insurance and M.R. Evid. 403

[¶ 14] The representatives further assert that the trial court erred in excluding evidence regarding Dr. Radke's relationship with O'Rourke's insurer. They contend that the court, in referencing our decision in *Todd v. Andalkar,* 1997 ME 59, 691 A.2d 1215, failed to engage in the balancing required by M.R. Evid. 403. We afford a trial court wide discretion to determine whether the danger of unfair prejudice posed by relevant evidence substantially outweighs the value of proffered evidence under M.R. Evid. 403. *See State v. Millay,* 2001 ME 177, ¶ 11, 787 A.2d 129, 131–32; *Andalkar,* 1997 ME 59, ¶ 6, 691 A.2d at 1217. Contrary to the representatives' contention, the trial court engaged in a proper balancing of the probative value of the evidence proffered against the risk of unfair prejudice.

[¶ 15] In *Andalkar,* we found that the trial court had abused its discretion in excluding evidence of bias where the expert medical witness (1) was a founder and insured of MMIC; (2) currently served as vice-president of MMIC and received an annual salary; (3) set the compensation MMIC paid for expert testimony; (4) served on its executive committee; and (5) had reviewed claims in the past. 1997 ME 59, ¶ 5, 691 A.2d at 1217.

[¶ 16] Here, in contrast, the representatives sought to premise the introduction of insurance based on the facts that Dr. Radke (1) was insured by MMIC; (2) received dividends as an insured in an amount directly related to the amount MMIC paid out in claims; (3) had previously testified on MMIC's behalf; and (4) received a large portion of his expert witness fees from MMIC. In short, Dr. Radke's connection to MMIC was markedly less substantial than was true for the expert witness in *Andalkar,* who was an officer of MMIC and on its payroll.[2]

---

*Blance v. Alley,* 404 A.2d 587, 589 (Me.1979). In this case, the trial judge did not reconsider the decision of another judge. Moreover, it is inconsistent with the policy supporting the law of the case doctrine to apply the doctrine to in limine evidentiary rulings because it is often not possible to accurately balance the probative value or the prejudicial impact of proposed evidence prior to trial. *See State v. Brackett,* 2000 ME 54, ¶¶ 6–7, 754 A.2d 337, 339 (recognizing that in limine rulings are normally not final until the evidence is offered at trial); Field & Murray, *Maine Evidence* § 103.7 at 25 (2000 ed.); *United States v. Griffin,* 818 F.2d 97, 104 (1st Cir.1987) ("[I]t is too great a handicap to bind a trial judge to a ruling on a subtle evidentiary question, requiring the most delicate balancing, outside a precise factual context.").

**2.** Some jurisdictions characterize this analysis as a "substantial connection" test, whereby a court "looks to whether a witness has a sufficient degree of connection with the liability insurance carrier to justify allowing proof of

this relationship as a means of attacking the credibility of the witness." *Bonser v. Shainholtz,* 3 P.3d 422, 425 (Colo.2000) (quotation marks omitted). For a number of jurisdictions, commonality of insurance—where a witness's economic interest is the potential for an increase in premiums—is, without more, insufficient to outweigh the danger of unfair prejudice because the "likelihood of bias is so attenuated that the risk of prejudice substantially outweighs the probative value." *Id.* at 425–26 (collecting cases); *Lombard v. Rohrbaugh,* 262 Va. 484, 551 S.E.2d 349, 355–56 (2001) (same); *see also Mills v. Grotheer,* 957 P.2d 540, 543 (Okla.1998) (taking this reasoning a step further and applying it to mutual insurance where the financial interest is the risk of a decrease in dividends). *But see Vasquez v. Rocco,* 267 Conn. 59, 836 A.2d 1158, 1165 n. 7 (2003) (cautioning that when the insurance is mutual insurance, the insurer is very small, and the exposure is great, fairness may require that the balance be struck in favor of admissibility). The Ohio Supreme Court stands alone in having laid out a rule

Here, the probative value of Dr. Radke's connection to MMIC was outweighed by the danger, otherwise safeguarded against by Rule 411, that evidence that O'Rourke was insured against liability might unfairly prejudice the determination of whether she acted negligently. *See* M.R. Evid. 411 ("Evidence that a person was or was not insured against liability is not admissible upon the issue whether the person acted negligently or otherwise wrongfully."). Under the circumstances, the court struck the proper balance when it excluded evidence of Dr. Radke's relationship with O'Rourke's insurer.

## C. Motion for a New Trial

 [¶ 17] Finally, contrary to the personal representatives' contention, the trial court did not abuse its discretion in denying their motion for a new trial. The jury was presented with competing expert testimony and chose to credit the testimony offered by the defense. It is for the jury, not the court, to determine the degree of credibility to which witnesses are entitled. *Daniel v. Ouellette*, 560 A.2d 566, 568 (Me.1989).

The entry is:

Judgment affirmed.

---

that evidence of mutual insurance is per se admissible as evidence of bias. *See Ede v. Atrium S. OB–GYN, Inc.*, 71 Ohio St.3d 124, 642 N.E.2d 365, 368 (1994).